UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                    :
CHRISTIAN LOUIS TAYLOR      :         3:18 CV 1539 (RMS)
                    :
v.                    :
                    :
ANDREW M. SAUL,         :
COMMISSIONER OF        :
SOCIAL SECURITY[1]       :        DATE: AUGUST 19, 2019
                    :
------------------------------------------------------ x

<u>RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA" or "the Commissioner"]

denying the plaintiff Social Security Disability Insurance ["SSDI"] benefits.

I.    <u>ADMINISTRATIVE PROCEEDINGS</u>

On or about February 25, 2014, the plaintiff protectively filed an application for SSDI

benefits claiming that he had been disabled since October 5, 2012, due to the following

impairments: back injury; neck injury; tarsal tunnel syndrome; "painful weeping skin lesions, cysts

in rectum, chronic"; compromised immune system; Raynaud's syndrome; diabetes; "candida

albicans, chronic"; food and respiratory allergies; and nerve damage. (Certified Transcript of

Administrative Proceedings, dated October 16, 2018 ["Tr."] 138, 154; *see* Tr. 367–68). The

Commissioner denied the plaintiff's application initially and upon reconsideration. (Tr. 138–53,

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security. (Doc.
No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill
was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A.
Berryhill as the named defendant. *See* FED. R. CIV. P. 25(d). The Clerk of the Court shall amend the caption in this
case as indicated above.

200–04; Tr. 154–69, 206–09). On September 4, 2014, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"] (Tr. 210–11), and on November 12, 2015, a hearing was held before ALJ Peter Alexander Borré, at which the plaintiff and a vocational expert, Howard Steinberg, testified. (Tr. 89–136; *see* Tr. 237–56, 259–84, 287–92). On March 17, 2016, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 170–91). On March 28, 2016, the plaintiff requested review of the hearing decision (Tr. 296–98), and on May 4, 2017, the Appeals Council remanded the plaintiff's claim to the ALJ for another hearing. (Tr. 192–96).

On October 24, 2017, ALJ Borré held a second hearing, at which the plaintiff and a vocational expert, Edmond Calandra, testified. (Tr. 47–88, 324–52, 355–60). On February 28, 2018, the ALJ issued another unfavorable decision denying the plaintiff's claim for benefits. (Tr. 9–37). The plaintiff requested review of the second hearing decision; however, on July 20, 2018, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

On September 11, 2018, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on September 12, 2018, the Court granted his Motion for Leave to Proceed *In Forma Pauperis* (Doc. No. 7). On September 24, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was assigned to this Magistrate Judge. (Doc. No. 11). The defendant filed the Certified Administrative Transcript on November 13, 2018. (Doc. No. 13). On November 15, 2018, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 16), brief in support (Doc. No. 16-1 [Pl.'s Mem.]), Statement of Material Facts (Doc. No. 16-2), and three exhibits (Doc. Nos. 16-3–16-5). The defendant filed his Motion to Affirm the decision of the Commissioner on April 3, 2019 (Doc. No. 22), with brief in support (Doc. No. 22-1 [Def.'s Mem.]), and Statement of Material Facts (Doc. No. 22-2).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 16) is DENIED, and the defendant's Motion to Affirm (Doc. No. 22) is GRANTED.

II.     FACTUAL BACKGROUND

At the time of his alleged onset date of disability, October 5, 2012, the plaintiff was forty-eight years old.  (*See* Tr. 138, 154).  The plaintiff is married and resides with his wife.  (Tr. 54).  He dropped out of school when he was a sophomore in high school, but later obtained a GED and a certificate in electromechanical assembly.  (Tr. 55).  At the time of the second hearing, the plaintiff was fifty-three years old.  (*See* Tr. 53).  The plaintiff's date last insured is December 31, 2017.  (Tr. 138, 154).

A.     MEDICAL HISTORY[2]

1.     THE RELEVANT EVIDENCE PRIOR TO THE PLAINTIFF'S ALLEGED ONSET DATE

On October 20, 2006, Dr. Daniel E. Nijensohn evaluated the plaintiff, who presented to Dr. Nijensohn with a complaint of "pain at the base of the neck radiating into the right shoulder without numbness and/or weakness, resolving."  (Tr. 678).  Dr. Nijensohn noted that "[t]he patient has x-ray and MRI evidence of cervical disc herniation at C4-5 and somewhat less at C5-6."  (Tr. 678).  Following a physical examination, Dr. Nijensohn "told him to continue with conservative management including therapy and medications for as long as [that] works."  (Tr. 679).  On March 6, 2008, Dr. Nijensohn evaluated the plaintiff again, noting that the plaintiff complained "of persistent neck pain for the past six months" and "lower back pain that has been bothering him for quite a long time[.]"  (Tr. 681).  X-rays and an MRI of the lumbar spine revealed "bilateral pars

---

[2] This recitation is taken primarily from the parties' respective Statements of Material Facts (Doc. Nos. 16-2 and 22-2).  Commonly used medical terms do not appear in quotation marks although the terms are taken directly from the plaintiff's medical records.

interarticularis defects at L5 with Grade I anterlisthesis and with a right L5-S1 disc protrusion and degenerative disc disease at L5-S1 and narrowing of the L5-S1 interspace." (Tr. 681). The images also revealed "bilateral spondylosis with a Grade I spondylolisthesis at L5 on S1, and anterolisthesis, with a right posterolateral intraforaminal local disc protrusion at L5-S1, impinging upon the right L5 nerve root." (Tr. 681). Dr. Nijensohn recommended that the plaintiff undergo cervical and lumbar spinal fusion surgeries. (*See* Tr. 682).

On March 13, 2008, the plaintiff underwent an "excision of herniated discs at C4-5 and at C5-6, followed by anterior interbody cage fusion, and internal fixation with metal plating and screws." (Tr. 683). On March 20, 2008, Dr. Nijensohn noted that the plaintiff had "done quite well" since the surgery and that the plaintiff ha[d] already noted improvement compared to the way he was preoperatively." (Tr. 683). Specifically, the plaintiff had "a good range of motion of the neck" and good "[s]trength of the upper extremities[.]" (Tr. 683). Dr. Nijensohn evaluated the plaintiff again on April 17, 2008, at which time he noted that the plaintiff "recovered beautifully from the standpoint of cervical spine surgery." (Tr. 684). Dr. Nijensohn explained that the plaintiff's "symptoms [were] gone[]" and that the plaintiff "fe[lt] real well." (Tr. 684). The treatment note reflects that the plaintiff continued to complain of lower back pain and that Dr. Nijensohn believed it was "the time to proceed with the posterior fusion of the lumbar spine[.]" (Tr. 684).

On May 1, 2008, the plaintiff underwent, *inter alia*, a "transforaminal posterior lumbar interbody fusion[.]" (Tr. 685). On May 8, 2008, Dr. Nijensohn evaluated the plaintiff and noted that he had "done beautifully" following surgery, "already feels much better," "woke up without pain into the right leg," "the sciatica is all gone[,]" and "[h]is toes are not numb anymore as they were before the surgery." (Tr. 685). Dr. Nijensohn added that the plaintiff was taking short walks,

that his neck also "fe[lt] great[,]" and that "he no longer ha[d] any nerve pains"; he concluded that the plaintiff was "happy and grateful and quite pleased with his progress." (Tr. 685). During a July 17, 2008 examination, the plaintiff stated to Dr. Nijensohn that he "occasionally hears noises in the lower back." (Tr. 686). Dr. Nijensohn advised the plaintiff to "wait a couple of months before returning back to work[,]" but noted that "[t]he most recent x-rays look pretty good." (Tr. 686).

Following an examination on September 25, 2008, Dr. Nijensohn stated that the plaintiff was "doing excellent and ready to be discharged from [Dr. Nijensohn's] care." (Tr. 687). The plaintiff was set to return to work within days and felt that he could "handle it." (Tr. 687). Although Dr. Nijensohn advised the plaintiff to start work "on a part-time basis and then increase his activities as tolerated[,]" he stated that "[x]-rays of the cervical and lumbar spine show excellent healing of the instrumented fusions and no complications or problems." (Tr. 687).

Moreover, on March 25, 2009, the plaintiff completed a tinnitus questionnaire, on which he answered questions regarding "head and ear noises[.]" (Tr. 590). He indicated on the form that he had experienced noises in his head and ears for two years and that the "quality of noise" included "ringing, whooshing, steam escaping, [and] pulsating[.]" (Tr. 590). The plaintiff indicated also that the noise was constant, varied in intensity, and occurred in both ears. (Tr. 590). The noise did not prevent the plaintiff from sleeping; however, he indicated that the noise was rated at a six on a scale of one to ten, with ten being "very loud" and seven or above being "noise that you feel you cannot live with." (Tr. 590). The plaintiff explained that stress, such as lifting something heavy, increased the noises and that he had a history of noise exposure from work. (Tr. 590). He noted also that he thought he had hearing loss and that he had headaches, blurred vision, and "[h]ead or [n]eck [t]rauma." (Tr. 590). The plaintiff completed a hearing test on April 1, 2009,

which revealed that his hearing was within normal limits, but sloping to mild to moderate sensorineural hearing loss. (Tr. 595).

2. <u>STAYWELL HEALTHCARE RECORDS</u>

The plaintiff has an extensive treatment history with Staywell Healthcare ["Staywell"]. On March 12, 2014, the plaintiff presented to Staywell and complained of "pain in his neck and back" and "pain in multiple other sites throughout his body." (Tr. 544). Dr. Monika Kaul evaluated the plaintiff. A review of the plaintiff's symptoms revealed that he had neck and back pain, but "[n]o lump or swelling in the neck[,]" and that he had "no tinnitus." (Tr. 545). A physical examination revealed that the plaintiff had "tenderness [in the] lumbar area" and that the "[c]ervical spine showed full range of motion limited." (Tr. 546). His gait and stance were normal. (Tr. 546). Dr. Kaul referred the plaintiff to physical therapy for his neck and back pain (Tr. 573) and, following an examination on April 11, 2014, she referred the plaintiff to a neurosurgeon for cervical pain. (Tr. 547).

The plaintiff underwent imaging of his spine on April 7, 2014, which revealed anterior fusion at C4-C5 and C5-C6, as well as "[d]egenerative changes with narrowing of the disc space at C7-T1 and C6-C7, as well as encroachment on the neural foramina in the oblique views at C6-C7 on the right and C4-C5 and C5-C6 on the left." (Tr. 716). This imaging revealed also "[s]tatus post posterior lumbar fusion and decompression at L5/S1" but "[n]o significant degenerative disease above the level of fusion." (Tr. 717). The plaintiff underwent a CT scan of his spine on May 21, 2014, which revealed, *inter alia*, the following: unremarkable findings in the thoracic spine (Tr. 559, 561); and "anterior cervical and incomplete intradiscal fusion at C4-C5 and C5-C6[,]" as well as "[m]ild multilevel neuroforaminal stenosis involving the right C3-C4, right C4-

C5, and bilateral C5-C6 and C6-C7 neuroforamen," but "no significant central spinal stenosis" in the cervical spine (Tr. 560).

On July 7, 2014, the plaintiff presented to Staywell where Dr. Anna Timell completed an examination. (Tr. 706–07). The plaintiff complained of "back pain, pain travel on his shoulders and neck, also ha[d] problems with his metatarsal arch[.]" (Tr. 706). A review of the plaintiff's neurological system revealed that he had "dysethesias, numbness and tingling in the [left] forearm, [right] hand and arm in varying locations and at varying times, occasionally has sharp pain in the [right] 3rd and 4th fingertips." (Tr. 706). Dr. Timell noted that the plaintiff "appeared uncomfortable" at the appointment. (Tr. 706). She noted also that the plaintiff's "[n]eck demonstrated a decrease in suppleness[, and that] he had good lateral rotation, [but] poor flexion and extension." (Tr. 706). Dr. Timell stated that the plaintiff had "[a]bnormal movement of all extremities [and a] trigger nodule [at the] upper [right] trapezius." (Tr. 707). She diagnosed the plaintiff with cervicalgia and muscle spasm, for which she prescribed medications. (Tr. 707).

In August 2014, Dr. Timell examined the plaintiff again and noted that he had a "rigid back[,]" but that his motor strength was normal and he rose "to heels and toes well." (Tr. 736–37). She diagnosed the plaintiff with, *inter alia*, lumbar spondylosis and prescribed a Lidoderm patch. (Tr. 737). On December 31, 2014, the plaintiff contacted Dr. Timell and stated to her that he was "upset at not being able to get the help that he feels he needs." (Tr. 742). Dr. Timell noted that, "[a]fter some discussion," they "agreed [she] could help [the plaintiff] by writing a letter to support his SSD application."[3] (Tr. 742). The plaintiff underwent an MRI of his thoracic spine in November 2014, which revealed (1) "T5-T6 mild left paracentral disc herniation, without canal

---

[3] In this letter, Dr. Timell noted, *inter alia*, that it was her "medical opinion" that the plaintiff was "permanently and totally disabled on the basis of degenerative disc disease and accompanying chronic pain. He would be incapable of any gainful employment and [she] would not expect [the plaintiff] to be able to participate in any re-training programs." (Tr. 756).

narrowing[,]" and (2) "T7-T8 tiny left paracentral disc herniation, without canal narrowing." (Tr. 750). He also underwent an MRI of his cervical spine in November 2014, which showed (1) "[s]tatus post C4-C6 anterior fusion[,]" (2) "C3-C4 mild central disc herniation[ with] [n]o central canal narrowing[,]" and (3) "C3-C4 mild spondylotic right neural foraminal narrowing[,] C5-C6 mild spondylotic right greater than left neural foraminal narrowing[, and] C6-C7 mild bilateral spondylotic neural foraminal narrowing." (Tr. 752).

The plaintiff returned to Dr. Timell on June 4, 2015 and complained that his "[l]egs are getting weaker, having difficulty walking[,]" and that he wanted "his progressive disability documented for an upcoming SSD hearing." (Tr. 743). Under the review of systems, Dr. Timell noted that the plaintiff had "neck and low back pain, especially if he tries to look down, or if he stands very long or tries to do household chores." (Tr. 743). She added that the plaintiff "reported he can no longer mow his own lawn," and that "the pain appears to vary in intensity and sometimes puts him down on the floor." (Tr. 743). She noted also that the plaintiff reported "muscle twitching and sensory disturbances [and] report[ed] burning pain in his [left] foot." (Tr. 743). A physical examination revealed that the plaintiff's "[c]ervical spine did not show full range of motion – [right] anterior neck scar[ and] limited lateral rotation." (Tr. 744). Examination of the plaintiff's lumbar spine "did not demonstrate full range of motion – all movement occur[red] above the level of his fusion, there was marked para-thoracic muscle spasm above the surgical scar with spontaneous twitching after attempted lateral flexion." (Tr. 744). The plaintiff "walked well on heels and toes" but "ambulated antalgically with a stiff [left] knee and out-toeing, no Trendelenberg"; however, Dr. Timell opined that "the etiology of his gait disturbance [was] unclear to [her]." (Tr. 744).

On October 29, 2015, Dr. Timell completed a form on which she opined about the plaintiff's ability to do physical activities. (Tr. 753–55). She indicated that the plaintiff's diagnoses were cervical spondylosis, lumbar spondylosis, and diabetes, and that his prognosis was "poor." (Tr. 753). Dr. Timell opined that the plaintiff could walk one city block without rest, that he could sit continuously for forty-five minutes, and that he could stand continuously for thirty minutes. (Tr. 753). In an eight-hour workday, Dr. Timell believed the plaintiff could sit for "about 4 hours" and "stand/walk" for "about 2 hours." (Tr. 753). She added that the plaintiff needed a job that permitted shifting positions "at will from sitting, standing or walking[,]" and that he would need to take unscheduled breaks every thirty minutes and rest for about fifteen minutes before returning to work. (Tr. 753–54). Dr. Timell opined that the plaintiff could occasionally lift and carry up to ten pounds during the workday; however, he could never lift and carry more than ten pounds. (Tr. 754). Dr. Timell indicated that the plaintiff had "significant limitations in doing repetitive reaching, handling, or fingering[.]" (Tr. 754). Specifically, Dr. Timell noted that the plaintiff could do the following: use his hands to grasp, twist, and turn objects for ten percent of an eight-hour workday; use his fingers for fine manipulations for fifty percent of an eight-hour workday; and use his arms for reaching, including overhead reaching, for ten percent of an eight-hour workday. (Tr. 754). In addition, Dr. Timell opined that the plaintiff could never bend, twist, crouch, climb stairs, or climb ladders, and that he should avoid exposure to extreme cold and cigarette smoke. (Tr. 755). She thought that the plaintiff's condition would not be likely to produce good days and bad days, and in response to a question asking how often the plaintiff's impairments would cause him to the absent from work, Dr. Timell answered, "[C]an't work." (Tr. 755).

On February 11, 2016, Dr. Timell saw the plaintiff for a follow-up appointment after the plaintiff went to the emergency room the previous week due to back pain.[4] (Tr. 767–70). Dr. Timell noted that the plaintiff presented "with a litany of indigent complaints about doctors who haven't helped him, apparently a consulting MD has told [SSA] that [the plaintiff] is not disabled." (Tr. 767). The plaintiff denied depression, but noted that he has "always been melancholy[.]" (Tr. 768). Under "review of symptoms," Dr. Timell noted neck pain and low and thoracic back pain. (Tr. 768). She noted also "[s]ensory disturbances [left] arm radicular pain to the index finger, [right] arm radicular pain to 4th and 5th fingers; [left] radicular pain radiating to 4th and 5th toes; all pain also assoc[iated] with paresthesias." (Tr. 768). The plaintiff appeared at the appointment "wearing a soft neck colla[r]." (Tr. 769). A physical examination revealed that both the cervical and lumbosacral spine "did not demonstrate full range of motion." (Tr. 769). In his lumbosacral spine, the plaintiff "had marked [right] parathoracic muscle spasm, he also had virtually no lateral flexion in thoracic or lumbar spines." (Tr. 769). The plaintiff's strength was normal, he was able to walk on his heels and toes, had "no arm drift[,]" normal grip, and normal interossei. (Tr. 769). The plaintiff's gait and stance were abnormal, as he limped with his right leg; his reflexes were abnormal, as his "[right] biceps jerk [greater than] [left]." (Tr. 769). Dr. Timell prescribed Cyclobenzaprine for the plaintiff's neck pain and referred the plaintiff for a nerve conduction study of his upper and lower extremities. (Tr. 770). The doctor who performed the nerve conduction test concluded that "[t]here is no definitive electrodiagnostic evidence for a neuropathy or radiculopathy in the arms or legs." (Tr. 803).

---

[4] A physical examination in the emergency room revealed "pain with palpation of [left] side low back by gluteal region, full passive [range of motion] of knee[,] [negative] straight leg raise, decreased range of motion with back flexion/extension, mild tenderness when [left] low back palpated[.]" (Tr. 780).

The plaintiff underwent a CT scan of his lumbar spine on March 4, 2016, which revealed postoperative changes "at L5-S1 status post laminectomy and posterior fusion. Grade 1 anterolisthesis of L5 on S1. Left L5 pedicle screw traverses the superior endplate with tip noted along the L4-L5 disc space. Hypertrophic changes of the posterior facets results in moderate right and mild left L5-S1 neural foraminal stenosis." (Tr. 799).

On April 11, 2016, Dr. Timell noted that, during a physical examination, the plaintiff "[sat] comfortably on the exam table, [and] move[d] about the room normally." (Tr. 777). She also referred the plaintiff for a neurosurgical consultation to "advise if removal of the [left] pedicle screw would be advisable" (Tr. 777), as the plaintiff worried that the position of the screw might be the cause of his "ongoing intermittent sharp back pain that brings him to his knees" (Tr. 775).

During a physical examination on April 13, 2017, Dr. Timell noted that the plaintiff "did not demonstrate full range of motion" in his thoracolumbar spine and had "[left] para-thoracic muscle spasms." (Tr. 878). The plaintiff had the ability to stand on his heels and toes and had normal motor strength. (Tr. 878–79). However, Dr. Timell noted that the plaintiff had an abnormal gait and stance and that he walked with a cane in his left hand. (Tr. 879). Dr. Timell determined that the plaintiff's "deep tendon reflexes" were abnormal. (Tr. 879).

On July 27, 2016 and August 29, 2017, Susan Murray, MA, LPC, LADC, the plaintiff's mental health treatment provider, submitted letters discussing the plaintiff's mental health treatment "in lieu of confidential psychiatric records[.]" (Tr. 823; Tr. 815). Ms. Murray noted that the plaintiff's current diagnosis was "Major Depressive Disorder, recurrent, severe, without psychotic features" (Tr. 815, 823), and that the plaintiff was prescribed Cymbalta and Buspirone (Tr. 815, 823), as well as Wellburtin SR (Tr. 823) to treat his condition. In the August 2017 letter, Ms. Murray noted that the plaintiff continued to participate in weekly, individual therapy and that

he had participated in a "six-week psycho-educational group for Chronic Pain Management[.]" (Tr. 823). She added that the plaintiff "participated actively in his treatment and made appropriate clinical progress." (Tr. 823).

### 3. YALE NEW HAVEN HEALTH RECORDS

Throughout the relevant period, the plaintiff also sought treatment with Yale New Haven Health ["Yale"]. On September 21, 2016, the plaintiff presented to Yale with complaints of "low back pain." (Tr. 825). A physical examination of the plaintiff revealed "full strength throughout bilateral upper and lower extremities, normal tone. Able to heel and toe walk without difficulty. Full painless range of motion of the bilateral lower extremities. No pain with bilateral hip range of motion. No trochanteric bursa tenderness." (Tr. 827). The examination revealed also that the plaintiff "ambulate[d] without antalgic gait" and "[did] not require assistive device for ambulation." (Tr. 828). The physician's assistant who evaluated the plaintiff referred the plaintiff for a bone scan to check for pseudoarthrosis.[5] (Tr. 828).

A physical examination on November 30, 2016 revealed the following with respect to the plaintiff's head and neck: "[n]o restriction in cervical flexion, extension, rotation, or lateral bending"; "[n]o pain with cervical flexion, extension, rotation, or lateral bending"; "[n]o tenderness to palpation over posterior cervical spine or trapezius muscles"; "[n]egative Spurling's maneuvers"; and "[n]egative Lhermitte's sign." (Tr. 831). The examination revealed the following regarding the plaintiff's "spin/ribs/pelvis": "[n]o tenderness to palpation over the spine or buttocks"; "[n]o previous incisions"; "[n]o restriction in thoracolumbar flexion, extension, rotation, or lateral bending"; "[n]o pain in back or legs with flexion or extension"; and "[n]o elevation of shoulders or pelvis." (Tr. 831). Regarding the plaintiff's extremities, the examination

---

[5] The bone scan did not show any evidence of pseudoarthrosis. (Tr. 832).

revealed the following: "[n]ormal peripheral pulses with no edema, swelling, varicosities, or lymphadenopathy"; "[n]ormal alignment and muscle tone with no masses, asymmetric atrophy/hypertrophy, tenderness to palpation, ligamentous instability, or crepitus/effusions/subluxations of the major joints"; and "[n]egative straight leg raising tests." (Tr. 831). The examination revealed also that the plaintiff had no difficulty heel and toe walking; however, he "require[d] an assistive device for ambulation" and had an antalgic gait. (Tr. 831). The plaintiff's strength, sensation, and reflexes were all normal.[6] (Tr. 831–32).

The plaintiff underwent an MRI of his lumbar spine on April 11, 2017, which revealed "[s]tatus post lumbar fusion and decompression at L5/S1 with severe right neural foraminal narrowing at that level. No focal disc herniation identified. No significant narrowing of the central canal." (Tr. 870–71). On June 27, 2017, the plaintiff underwent an x-ray of his entire spine, which revealed "bony consolidation across the disc space at C4-C5 and partially so at C5-C6 posteriorly." (Tr. 872). The x-ray revealed also that there was "[n]o significant abnormality" and "no significant degenerative changes" of the thoracic spine. (Tr. 872). The x-ray showed that one of the pedicle screws in the plaintiff's lumbar spine "appear[ed] to breach the superior plate of L5" and that there was "[m]ild anterolisthesis of L4-L5 on S1." (Tr. 872). The imaging report concluded that "there has been no significant interval change." (Tr. 872). Dr. Luis Enrique Kolb discussed surgical and non-surgical options with the plaintiff on June 27, 2017 and August 8, 2017, following which the plaintiff opted to continue non-surgical interventions. (Tr. 857–61).

### 4. CONSULTATIVE EXAMINATIONS

On March 26, 2014, Dr. Yacov Kogan performed a consultative examination of the plaintiff for Connecticut Disability Determination Services. (Tr. 551–56). The plaintiff reported

---

[6] A physical examination on June 27, 2017 revealed findings identical to those noted in the November 2016 examination. (*See* Tr. 856–87).

to Dr. Kogan "a history of chronic, intermittent and migratory pain affecting the entire posterior torso and the upper and lower extremities bilaterally and diffusely for several years." (Tr. 551). Dr. Kogan noted the plaintiff's two spinal fusion surgeries and that the plaintiff had received cortisone injections in both feet for tarsal tunnel syndrome. (Tr. 551). The plaintiff stated to Dr. Kogan that "he has self diagnosed Raynaud's after comparing his symptoms to his wife's symptoms who has the diagnosis, but he has never received the diagnosis by a physician." (Tr. 551). He reported also "a history of chronic and daily symptoms of congestion, sore throat, watery eyes, sneezing, subjective fevers, and wheezing with mild shortness of breath[,]" which the plaintiff attributed to various allergies. (Tr. 551). The plaintiff told Dr. Kogan that "he has had a perianal cyst for about 6 months" and that "[t]he cyst hurts to touch." (Tr. 551). Finally, the plaintiff noted "a history of diabetes mellitus[,]" which "has been diet controlled" and for which the plaintiff "has never taken any medications[.]" (Tr. 552).

Following a physical examination, Dr. Kogan provided a medical source statement. (Tr. 553–54). He stated that "there are no range of motion deficits and no neurological deficits that limit sitting, standing, walking, bending, lifting, carrying, reaching or fine finger manipulations"; however, such activities "are mildly limited due to generalized musculoskeletal pain." (Tr. 554). Dr. Kogan concluded that "there is no evidence of Raynaud's in the fingers or toes[,]" and that there were "no active rashes appreciated." (Tr. 554). He added that there was "no congestion, no rhinorrhea, no lacrimation, no sneezing, [and that] the oropharynx [was] clear without erythema, there [was] no submandibular or cervical lymphadenopathy[, and] [t]he lungs [were] clear to auscultation bilaterally." (Tr. 554). Lastly, Dr. Kogan determined that there was "no evidence of functional limitation stemming from peripheral neuropathy including no distal extremity sensory loss, preserved Romberg, and no evidence of sensory ataxia. There [were] no foot ulcers. Visual

acuity uncorrected on the [right]: 20/50 (near) and uncorrected on the [left]: 20/50 (near)." (Tr. 554).

On May 29, 2014, Dr. Diana Badillo Martinez completed a mental status examination of the plaintiff. (Tr. 902–05). He reported to Dr. Martinez his medical history. (Tr. 902). During the mental status examination, Dr. Martinez noted that the plaintiff "appeare[d] much older than his years" and "ambulate[d] slowly with a mild limp." (Tr. 903). She noted also that the plaintiff's thought processes were "adequately abstract with above average understanding of hypothetical rules and convention[ and] [h]is intellectual abilities impress[ed] being higher than average." (Tr. 903). Dr. Martinez stated that the plaintiff's attention span and ability to perform mental operations were "within the norm[,]" and that the plaintiff reported "feeling anxious, often depressed due to many life stressors such as health, the wife's health, unemployment, and finances." (Tr. 903). Dr. Martinez opined that "[p]ain management with a psychological component may assist [the plaintiff in] gaining understanding of the relationship between his emotions and exacerbations of pain and providing pain medication to manage." (Tr. 903). She added that "[t]he medical factors impress[ed] being primary ones limiting his ability to work. Psychological status would not interfere with his capacity to work." (Tr. 904). She diagnosed the plaintiff with "[g]eneralized anxiety disorder . . . [e]motional factors contributing to medical condition[.]" (Tr. 904).

## 5. STATE AGENCY CONSULTANT OPINIONS

In June 2014, State agency consultants completed an assessment of the plaintiff. (*See* Tr. 138–52). This assessment provided that the plaintiff had the following severe impairments: spine disorders; diabetes mellitus; affective disorders; and anxiety disorders.[7] (Tr. 145). The assessment

---

[7] At the reconsideration level, the State agency consultant determined that the plaintiff's diabetes was a non-severe impairment. (Tr. 161).

provided also that the plaintiff experienced a mild restriction in his activities of daily living, moderate difficulties maintaining concentration, persistence, or pace, moderate difficulties maintaining social functioning, and one or two repeated episodes of decompensation each of extended duration.[8] (Tr. 145).

State agency consultant Dr. Robert Mogul opined that the plaintiff had the following exertional limitations: he could occasionally lift and carry fifty pounds; he could frequently lift and carry twenty-five pounds; he could stand and/or walk for about six hours in an eight-hour workday; he could sit for about six hours in an eight-hour workday; and he had no pushing or pulling limitations. (Tr. 147). Dr. Mogul opined that the plaintiff had the following postural limitations: he could frequently climb ramp and stairs, stoop, kneel, and crouch; he could occasionally crawl and climb ladders, ropes, or scaffolds; and he had an unlimited ability to balance. (Tr. 147–48). He opined also that the plaintiff had no manipulative, visual, communicative, or environmental limitations.[9] (Tr. 148).

State agency consultant Gregory Hansen, PhD, opined that the plaintiff was "not significantly limited" in the following categories: carrying out very short and simple instructions; carrying out detailed instructions; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; making simple work-related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors;

---

[8] At the reconsideration level, the State agency consultant reached the same conclusions, except that he opined that the plaintiff had only mild difficulties in maintaining social functioning. (Tr. 162).

[9] At the reconsideration level, the State agency consultant reached the same conclusions regarding the plaintiff's physical RFC, except that he limited the plaintiff to only occasional crouching. (Tr. 164).

getting along with coworkers or peers without exhibiting behavioral extremes; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. (Tr. 149). Dr. Hansen opined that the plaintiff was "moderately limited" in the following categories: maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods; and interacting appropriately with the general public.[10] (Tr. 149).

B.     ACTIVITIES OF DAILY LIVING

On March 11, 2014, the plaintiff completed a form titled "Activities of Daily Living[,]" on which he described his daily routines. (Tr. 393–402). In response to a question that asked what the plaintiff did "from the time you wake up until the time you go to bed[,]" the plaintiff stated, "I wake up because of pain. I spend my day trying to manage my pain." (Tr. 393). The plaintiff explained also that he cares for his wife by reminding her to eat and take her medications, preparing pre-packaged meals, driving her to the doctor when he can, and assisting her with "washing/bathing, etc." (Tr. 393). The plaintiff noted that he cares for two cats by feeding and petting them (Tr. 393), and that he receives no help from others in caring for his wife and pets (Tr. 394).

In response to a question that asked, "What were you able to do before your illnesses, injuries or conditions that you **CANNOT** do now[,]" the plaintiff answered, "[W]ork, hobbies, vacation, socialize, relations with wife, concentrate, read." (Tr. 394) (emphasis in original). The

---

[10] At the reconsideration level, the State agency consultant reached the same conclusions, except that he determined that the plaintiff did not have any social interaction limitations. (Tr. 165). The activities that fall within social interaction are as follows: interacting appropriately with the general public; asking simple questions and requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. (*See* Tr. 149).

plaintiff explained that his impairments affect his sleep because he "cannot sleep through the night, [he] cannot get comfortable[] due to different types of pain." (Tr. 394). The plaintiff explained that, due to his impairments, his ability to dress is affected as he "wear[s] oversized sweat pants and sweat shirts because they are easy to take on and off and [he] can sleep in them." (Tr. 394). He stated that his ability to shower was affected because he and his wife have to "guard one another in the shower[,]" and that, due to his impairments, he only shaves once per week and keeps his hair cut "as short as possible." (Tr. 394). The plaintiff explained also that his impairments cause him to experience pain when he feeds himself and, due to pain, he sits when he urinates. (Tr. 394). The plaintiff indicated that, at that time, he did not take any medications for his symptoms. (Tr. 394–95).

The plaintiff stated that he prepared his own meals daily, usually frozen dinners, which took about twenty to thirty minutes to make. (Tr. 395). He indicated that his cooking habits had changed since his impairments began. (Tr. 395). Regarding household chores, the plaintiff stated, "I sweep the floor. I load the dishwasher. I do laundry as needed with assistance[,]" and these chores took "all day" and he completed them "as needed[.]" (Tr. 396). He indicated that he needed encouragement or help to complete the household chores, noting specifically that his "wife will let [him] know if she or [he] need[] clean clothes, or clean dishes. If there is any lifting[, they] do it together, but avoid it as much as possible." (Tr. 396). The plaintiff stated that he does not do any yardwork because he "can't" and that he only goes outside "as needed (very little)." (Tr. 396). He explained that, when he goes out, he travels by car and can go out alone, noting that he does drive, "but not far at all without being in pain to the point of distraction." (Tr. 396).

The plaintiff represented that he goes grocery shopping approximately "once every 2 weeks" but that "[i]t takes several hours." (Tr. 397). He indicated that he can pay bills and handle

a savings account; however, he cannot count change or use a checkbook or money order. (Tr. 397). He elaborated that he and his wife "pay our bills mostly by AFT. [He] never counts change[.] [His] wife and [he] track [money] together. It is painful to write." (Tr. 397). The plaintiff explained that his impairments have impacted his ability to handle money because "[his] hands don't work well due to pain ([a]lso [he] ha[s not] been able to work[)]." (Tr. 397). He stated also that, since the onset of his impairments, he stopped doing his hobbies and no longer had any hobbies. (Tr. 397). Regarding his social activities, the plaintiff noted that he does not socialize "at all" and does not go anywhere. (Tr. 398). He stated that he has trouble getting along with others because he's "in pain which causes [him] to be angry and frustrated." (Tr. 398).

Additionally, the plaintiff indicated that his impairments have affected his ability to do the following: lift, as "[i]t often hurts to pick up a coffee" (Tr. 398, 400); squat, as he "often topple[s] over" (Tr. 398, 400); bend, as he is "fused at the top [and] bottom of [his] spine" (Tr. 398, 400); stand, as it "causes intense pain" (Tr. 398, 400); reach, as it "causes stabbing pain" (Tr. 398, 400); walk, as it "causes pain in [his] feet, back, neck, [and] hip" and he "can't walk far" (Tr. 398, 400); sit, as "after 10–15 min[utes]" he gets "intense pain in [his] back" (Tr. 398, 400); kneel, as he has "cysts on both knees [and] scar[] tissue from when [he] did flooring" (Tr. 398, 400); talk, as he "can't concentrate" (Tr. 398, 400); hear, as he has "tinnitus" (Tr. 398, 400); stair climb, as it "causes pain, [he] tr[ies] to avoid stairs" (Tr. 398, 400); see, as his "sight is often blurry" due to "allergies" (Tr. 398, 400); remember, as he "make[s] notes to remember important events, etc." (Tr. 398, 400); complete tasks, as he "do[es] what [he] can[,] [e]ven simple things take a long time, and don't get completed in 1 or 2 tries" (Tr. 398, 401); get along with others, as "people sense that [he is] in pain and get mad that [he] do[es not] get better, making interaction difficult" and because "[his] wife [and he] are isolated" (Tr. 398, 401); understand, as he is "not as sharp as [he] might

be because [he's] distracted by pain" (Tr. 398, 401); follow instructions, as he has to "check and re-check and still may be wrong" (Tr. 398, 401); use hands, as it is "not like it used to be[,] [his] finger tip[s] get tingly and feel like [he's] been cut" (Tr. 398, 401); and concentrate, as he is "distracted by pain, [e]ven simple tasks are sometimes beyond [him]" (Tr. 398, 401).

The plaintiff estimated that he could walk about "500–1000 f[ee]t" before he had to stop and rest, and that he could resume walking after resting for about "5–10 minutes[.]" (Tr. 399). He indicated also that he could pay attention for "5–10 minutes[,]" that he "may not be able to" finish what he starts, that he does not follow written instructions well, and that he follows oral instructions "o.k. if it's simple." (Tr. 399). The plaintiff stated that his ability to get along with authority figures was "[f]air," that he had never been fired from a job because of problems getting along with others, that he does not handle stress well, and that his ability to handle changes in routine was "[f]air." (Tr. 399). In response to a question about whether the plaintiff had noticed any unusual behaviors or fears, he answered, "I'm afraid of not being able to take care of myself and my wife." (Tr. 399). The plaintiff indicated also that he has worn orthotic shoe inserts since approximately 2009. (Tr. 399).

C.     THE PLAINTIFF'S 2017 HEARING TESTIMONY

At the hearing on October 5, 2017, the plaintiff testified that, since October 2012, his weight had increased "[m]aybe 15 pounds" and attributed it to "[g]etting a little older and not moving around all that much." (Tr. 54). He explained that he resided at home with his wife, and that his wife received disability payments due to a physical disability. (Tr. 54). The plaintiff testified that he had a driver's license, but that he could only drive "[s]hort distances" because, if he drives longer than that, he "get[s] very distracted from pain." (Tr. 55). The plaintiff testified

that he dropped out of high school during his sophomore year and later obtained a GED and a certificate in electromechanical assembly.  (Tr. 55).

The plaintiff then testified about his past work since 2002.  Between 2002 and 2009, the plaintiff repaired ultrasonic welding systems, which entailed "some nuts and bolts work, some pneumatic, some hydraulic and some electrical" work.  (Tr. 56).  The plaintiff estimated that, while doing this work, he would have to lift and carry fifty pounds.  (Tr. 56).  In 2009, the plaintiff was laid off from full-time employment; however, he returned to the same company as a temporary worker.  (Tr. 56–57).  As a temporary worker, the plaintiff was responsible for "assemblies, putting assemblies together[,]" which did not require the plaintiff to lift or carry a lot but, on occasion, he had to lift or carry "maybe" thirty pounds.  (Tr. 57).  In 2012, the company for which the plaintiff was working moved to Mexico, resulting in the plaintiff losing his temporary job; however, the plaintiff stated that he would not have been able to continue working past 2012 anyway, as he "was getting a lot of pain" in his "back and [his] neck, and also in [his] arms, [his] leg."  (Tr. 57–58).  The plaintiff did not file a Workers' Compensation claim.  (Tr. 58).

The plaintiff testified that, as of the date of the 2017 hearing, he was taking the following medications: Tramadol, which is for pain; Cyclobenzaprine, which is a muscle relaxer; Nabumetone, which is an anti-inflammatory; and Cymbalta, Wellbutrin, and Buspar, which are all anti-depressant and anti-anxiety medications.  (Tr. 58).  He testified also that these medications caused him to feel "sleepy, dizzy sometimes."  (Tr. 58).  The ALJ asked the plaintiff about his use of a cane, which the plaintiff explained he uses "[m]ost of the time" (Tr. 59) and had been using for approximately a year and a half (Tr. 58).  The plaintiff stated that Dr. Anna Timell, one of his treating physicians, prescribed the cane because the plaintiff "was having a little trouble with [his] balance and [he] ha[s not] taken a bad fall but [he] ha[s] fallen down a little bit."  (Tr. 59).  The

plaintiff testified that he did not use the cane "[f]or any kind of short walk," for instance "20, 30 steps." (Tr. 59). He testified also that he has a back brace and a neck brace that he uses "a couple of times a month[,]" and that "[s]ometimes it makes it feel better somewhat, and other times it really doesn't[.]" (Tr. 74).

Generally, the plaintiff thought he could walk about one hundred feet before needing to stop because "[t]he pain gets worse" in his "back, [his] leg and [his] neck, [and his right] arm." (Tr. 61–62). He testified that he could lift and/or carry "10 or 15 pounds," but if he tried to lift more, "[i]t would hurt right away" in his lower back. (Tr. 62). The plaintiff explained that he could use a computer and email, and that he did not have any problems using his hands on a keyboard.[11] (Tr. 62). The plaintiff testified that he dropped "very lightweight things" such as "silverware, change, pen[s] and pencil[s]" (Tr. 72), and that he had "problems" with buttons and zippers (Tr. 73). As of the 2017 hearing, the plaintiff testified that he could sit comfortably for about ten minutes before experiencing "a sharp pain in his lower back"; however, in 2012–14, he could sit about fifteen or twenty minutes before experiencing pain. (Tr. 67). To relieve the pain that he experienced while sitting, the plaintiff would "stand up and walk around" for about fifteen minutes; however, he needed a cane or something to hold on to for support because, after about five minutes, his back "just locks up and it starts hurting, and hurting more, and hurting more." (Tr. 68). If the plaintiff could not relieve the pain by either standing up or sitting down, he testified that he would "lay down for a while" even though there was not really a comfortable position. (Tr. 69). The plaintiff explained that the cause of his pain "could just be nothing," but that certain activities and the weather tend to make his pain worse. (Tr. 74). He testified that if he "help[s]

_____

[11] When the plaintiff's counsel asked whether the plaintiff experienced any difficulty sitting at the computer, however, the plaintiff responded, "More than 10 or 15 minutes and my . . . right arm goes numb and painful and tingly, and my hands don't work as well as they used to" and the numbness remains for "45 minutes or an hour or so, or it might be the rest of the day." (Tr. 71–72).

[his] wife in the shower one day, or do[es] the dishes or tr[ies] to do grocery shopping," he would "pay for that the following day" and "sometimes for a few days." (Tr. 74). The plaintiff noted that, in particular, grocery shopping caused pain from which it could take a couple of days for the plaintiff to recover. (Tr. 74). As a result, the plaintiff tried to limit the number of days he went grocery shopping to about once per month. (Tr. 74–75).

When the ALJ asked the plaintiff how his depression and anxiety affected his ability to focus and concentrate, the plaintiff responded that he had "racing thoughts." (Tr. 62–63). He stated also that he did not socialize much or have any friends that he saw on a regular basis; instead he spent his days resting and going to physical therapy appointments. (Tr. 63). The plaintiff represented that he cooked frozen meals or heated up food in a pan but that he did not "cook a meal from scratch." (Tr. 63). When the ALJ asked the plaintiff about housework, he replied that "[t]here's not a lot that's getting done"; specifically, he and his wife did laundry together, but yardwork and snow removal did not get done. (Tr. 63). The plaintiff continued that grocery shopping was "very difficult" because it involves "standing in one spot and . . . that makes [him] hurt very bad and there's a lot of standing deciding what [they're] going to get at the grocery store." (Tr. 64). The plaintiff testified that he had not done any outside activities, such as going out to eat or to a movie, "in a long time," and that he did not play the guitar much anymore because when he picked it up and tried to play "it hurts and [he] get[s] frustrated and put[s] it back down[.]" (Tr. 64). The plaintiff stated also that he could care for his two cats by feeding them and changing their litter and that he had not left the State of Connecticut in the past five years. (Tr. 64–65). The plaintiff testified that he read some, but had difficulty looking down at the book and focusing. (Tr. 71).

Moreover, the plaintiff testified that there was no plan for surgery, but that he attended physical therapy sessions twice per week. (Tr. 59–60, 69). He stated that he underwent two spinal fusion surgeries in 2008 (Tr. 76); however, he explained that "[i]t says in my records that both of the fusions that I had did not take. They're incomplete, it didn't fuse together." (Tr. 77). The plaintiff stated that the physical therapy "helped with [his] balance some . . . and with [his] strength some"; however, "it hasn't reduced the pain at all" and "[a]s a matter of fact, sometimes it makes [the pain] worse." (Tr. 60). He added that, "being injured like this" added to his lifelong depression. (Tr. 70). The plaintiff testified further that he saw a therapist once per week and a mental health specialist once every two months. (Tr. 60). The plaintiff also testified about a chronic pain management seminar that he participated in, which "was a group setup" that taught "some mental strategies for dealing with chronic pain" (Tr. 67), and that the theories he learned "sometimes" helped (Tr. 75). The plaintiff explained that his doctor told him to live with his impairments as long as he could, which to the plaintiff "means limited activity, limited socializing, limited ability to do much of anything that needs to be done around the house, clean the gutters or mow the lawn, stuff like that." (Tr. 70).

D.   VOCATIONAL EXPERT'S TESTIMONY

At the October 2017 hearing, a vocational expert, Edmond Calandra, testified. (Tr. 77–86). The plaintiff had no objection to Mr. Calandra's qualifications to testify as a vocational expert. (Tr. 78). Mr. Calandra classified the plaintiff's prior work as an "ultrasonic solderer," a light and semi-skilled job, SVP 3 as performed generally, and as an "assembler," a light and unskilled job as performed generally. (Tr. 78). Because the plaintiff testified that he lifted up to fifty pounds as an ultrasonic solderer, and up to thirty pounds as an assembler, Mr. Calandra explained that the jobs were "medium as performed." (Tr. 78–79).

The ALJ posed multiple hypotheticals to Mr. Calandra to determine whether an individual with the plaintiff's vocational profile and certain limitations would be able to do any work. Mr. Calandra testified that an individual of the plaintiff's age, education, and past work, who was limited to light work and "could not climb ladders, ropes, or scaffolds or tolerate exposure to hazards, such as open moving machinery or unprotected heights[, and] could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl, and was further limited to simple and repetitive tasks in an environment that did not have strict production quotas" would be able to do the job of "assembler as typically performed." (Tr. 80–81). When the ALJ added the limitation that the individual "required a cane when ambulating distances of 100 feet or greater or over uneven surfaces," Mr. Calandra testified that the individual would still be able to perform the job of assembler as performed generally. (Tr. 81). Mr. Calandra added that there would be additional jobs available to this hypothetical individual; specifically, a solderer and a gluer.[12] (Tr. 81).

III.    THE ALJ'S DECISION

Following the five-step evaluation process,[13] the ALJ found that the plaintiff's date last insured was December 31, 2017 (Tr. 15), and that the plaintiff had not engaged in substantial

---

[12] Mr. Calandra's testimony was consistent with the *Dictionary of Occupational Titles*, except with regard to the use of a cane, as the *Dictionary of Occupational Titles* "doesn't contemplate somebody who's using a cane." (Tr. 81–82). That portion of Mr. Calandra's testimony was based on his "professional experience and having viewed that occupation." (Tr. 82).

[13] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding regarding the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 78, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his

gainful activity since the alleged onset date of October 5, 2012. (Tr. 15, citing 20 C.F.R. § 404.1571 *et seq.*). The ALJ concluded that, as of the date last insured, the plaintiff had the following severe impairments: degenerative disc disease status post cervical and lumbar fusions in 2008 with recurrent lesions; Morton's neuroma; and depression.[14] (Tr. 15, citing 20 C.F.R. § 404.1520(c)). At step three, the ALJ concluded that, as of the date last insured, the plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16, citing 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). At step four, the ALJ found that, as of the date last insured, the plaintiff had the residual functional capacity ["RFC"] to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that he could not climb ladders, ropes, or scaffolds or tolerate exposure to hazards such as open moving machinery and unprotected heights; he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; he was limited to simple and repetitive tasks in an environment that did not have strict adherence to production quotas; and he required a cane when ambulating distances of 100 feet or greater or over uneven surfaces. (Tr. 18). The ALJ concluded that, as of the date last insured, the plaintiff was capable of performing his past relevant work as an assembler, as generally performed, because this work did not require the performance of work-related activities that the plaintiff's RFC precluded. (Tr. 30, citing 20 C.F.R. § 404.1565). In addition, after considering the plaintiff's age, education, work experience, and RFC, the ALJ concluded that additional jobs existed in significant numbers in the

---

former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[14] The ALJ noted also that the plaintiff's diabetes "has been well-controlled with diet and Januvia" and he has "not required emergency room care or inpatient treatment for diabetes-related complications and there is no evidence of end organ damage." (Tr. 15). The ALJ concluded that the plaintiff's diabetes was nonsevere. (Tr. 15). The ALJ discussed also the plaintiff's skin lesions, and noted that they were nonsevere, as they were "treated with oral and topical antibiotics as needed." (Tr. 15). Finally, the ALJ explained that the record does not establish the existence of a "severe medically determinable [mental] impairment until March 2016[.]" (Tr. 15).

national economy that the plaintiff could perform. (Tr. 30, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)). Specifically, the ALJ found that the plaintiff could perform the jobs of solderer and gluer. (Tr. 31). Accordingly, the ALJ concluded that the plaintiff was not under a disability, as defined in the Social Security Act, at any time from the alleged onset date of October 5, 2012, through the date last insured of December 31, 2017. (Tr. 31, citing 20 C.F.R. § 404.1520(g)).

## IV. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. *See Balsamo*, 142 F.3d at 79 (citation omitted). Second, the court must decide whether substantial evidence supports the determination. *See id.* The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if

supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff claims that the ALJ erred in several respects.  First, the plaintiff argues that the ALJ misapplied the treating physician rule when he afforded only "partial weight" to the opinion of Dr. Timell.  (Pl.'s Mem. at 10–16).  Second, the plaintiff argues that substantial evidence does not support the ALJ's RFC determination.  (Pl.'s Mem. at 16–22).  Third, the plaintiff argues that the ALJ erred in describing the plaintiff's past work.  (Pl.'s Mem. at 22–24).  Finally, the plaintiff argues that the ALJ determined erroneously that there existed jobs available in significant numbers in the national economy that the plaintiff could perform.  (Tr. 24–25).  The defendant maintains that substantial evidence supports all aspects of the ALJ's decision that the plaintiff was not under a disability during the relevant period.  (Def.'s Mem. at 1).  The Court agrees with the defendant.

A.    THE ALJ PROPERLY APPLIED THE TREATING PHYSICIAN RULE

The plaintiff claims that the ALJ misapplied the treating physician rule with respect to the opinion of Dr. Timell.  (Pl.'s Mem. at 10–16).  Specifically, the plaintiff argues that, because Dr. Timell's "opinion has not been contradicted by any treating or examining physician[,]" the ALJ should have "assigned Dr. Timell's opinion controlling weight because Dr. Timell has a long-standing treatment relationship with [the plaintiff, and] has conducted physical examinations of [the plaintiff] and has reviewed his objective test results."  (Pl.'s Mem. at 16).  The defendant

responds that Dr. Timell's opinion "was inconsistent with the other substantial evidence of record" and, therefore, the ALJ properly afforded it partial weight. (Def.'s Mem. at 5).

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion.").

Here, the ALJ afforded "partial weight" to the opinion of Dr. Timell. (Tr. 29). The ALJ reasoned that, in the December 31, 2014 letter in support of the plaintiff's SSDI application, Dr. Timell "mischaracterize[d] the claimant's medical history" when she stated that the plaintiff had his lumbar fusion surgery two years after his cervical fusion surgery. (Tr. 29) (citing Tr. 756). The ALJ continued:

> [Dr. Timell's] opinion is based on physical findings present on one physical examination and describes the claimant as "compliant with all treatments" though he did not pursue treatment recommendations to address the trigger nodule. Dr. Timell's characterization of the claimant's MRI findings is inconsistent with the

actual reports and with the interpretation of consulting neurosurgical specialists. The claimant's most recent imaging studies revealed postsurgical changes and mild findings . . . . The undersigned notes that Dr. Timell was unsure of the etiology of the claimant's gait disturbance based on her physical findings . . . . As for the extreme exertional and postural limitations assessed, these are not supported by objective findings, imaging studies, or the claimant's activities of daily living . . . . The extreme limitations on handling, fingering, and reaching are similarly unsupported by objective physical findings, the findings on neurosurgical consultation, and imaging studies . . . .

(Tr. 29) (citations omitted).

The ALJ's assignment of "partial weight" to the opinion of Dr. Timell was not improper. The ALJ reasoned correctly that Dr. Timell's characterization of the plaintiff's MRI findings was inconsistent with what the MRIs revealed. In her December 31, 2014 letter, Dr. Timell noted that the "[d]iagnostic studies include plain films, CT scans and MRIs all done in 2014" and that they revealed "evidence of diffuse vertebral degenerative disc disease involving the entire spine with disc herniations and nerve root impingements." (Tr. 756). A May 2014 CT scan of the plaintiff's thoracic spine, however, was "[u]nremarkable" and the report noted specifically, *inter alia*, that "[t]he disc spaces [were] preserved without narrowing or degenerative change." (Tr. 689). A May 2014 CT scan of the cervical spine revealed postoperative changes and "[m]ild multilevel neuroforaminal stenosis[,]" but "no significant central spinal stenosis." (Tr. 690). Additionally, imaging completed in April and May 2014 did not note any nerve root impingements. (*See* Tr. 689–90, 711–13, 716–17).

Moreover, although the plaintiff complained of "numbness/tingling/weakness" in his bilateral lower extremities, a nerve conduction study completed in 2016 revealed "no definitive electrodiagnostic evidence for a neuropathy or radiculopathy in the arms or legs." (Tr. 803). Additionally, in December 2014, the plaintiff demonstrated "5/5 strength symmetrically at the deltoid; biceps; triceps; wrist extensors; finger extensors and grip. Negative Hoffman's sign." (Tr.

765).  The plaintiff also demonstrated full strength and normal sensation and reflexes during a June 2017 examination.  (Tr. 856).  These objective medical findings do not support the conclusion that the plaintiff could use his hand and arms for only ten percent of an eight-hour workday and use his fingers for fifty percent of an eight-hour workday.  (*See* Tr. 754).  Accordingly, the objective medical evidence in the record does not support all of the limitations to which Dr. Timell opined and, therefore, the ALJ properly afforded her opinion partial weight.[15]

### B.  SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S RFC DETERMINATION

The plaintiff next claims that substantial evidence does not support the ALJ's RFC determination.  (Pl.'s Mem. at 16–22).  Specifically, the plaintiff argues that the RFC determination improperly limits the plaintiff to light work (Pl.'s Mem. at 17–18) and omits improperly limitations related to the plaintiff's hearing and fingering, handling, and reaching abilities (Pl.'s Mem. at 18–20).  The plaintiff argues also that "[t]he ALJ should have included a sit/stand/walk/rest option in [the plaintiff's] RFC."  (Pl.'s Mem. at 18).  The plaintiff maintains that consideration of these additional impairments and limitations "would result in a limitation to at most, sedentary exertional work, with additional non-exertional limitations."  (Pl.'s Mem. at 22).  The defendant responds that the "[p]laintiff did not carry his burden of demonstrating that he had a more limited RFC" and that the ALJ "considered all of [the] [p]laintiff's symptoms to the extent they could be reasonably accepted based on the regulations[.]"  (Def.'s Mem. at 7, 9).

The plaintiff's RFC is "the most [he] can still do despite [his] limitations" and is determined "based on all the relevant evidence in [the] case record[,]" namely, "all of the relevant medical and

---

[15] In her December 2014 letter, Dr. Timell opined that it was her "medical opinion" that the plaintiff was "permanently and totally disabled on the basis of degenerative spine disease and accompanying pain[,]" and that "[h]e would be incapable of any gainful employment . . . ."  (Tr. 756).  Such a determination, however, is reserved to the Commissioner.  *See* 20 C.F.R. § 1527(d).  Therefore, the ALJ properly did not afford this opinion controlling weight.

other evidence." 20 C.F.R. § 404.1527(a)(1), (3); *see also Gonzales v. Berryhill*, No. 3:17-CV-1385 (SALM), 2018 WL 3956495, at *14 (D. Conn. Aug. 17, 2018). "[A]n individual's RFC 'is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting Social Security Ruling ["S.S.R."] 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)). Before classifying a claimant's RFC based on exertional level, an ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. [§§] 404.1545 and 416.945." *Id.* (internal quotation marks omitted). The functions described in these paragraphs

> include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions; mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision; and other abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors.

*Id.* However, "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision[.]" *Id.* at 178 n. 3 (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). "This court must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record." *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (citing 42 U.S.C. § 405(g)) (summary order); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg

controls." *Id.* "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary." 20 C.F.R. § 404.1567(a). "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

Here, the ALJ concluded that the plaintiff could

perform light work as defined in 20 C.F.R. § 404.1567(b) except that he could not climb ladders, ropes, or scaffolds or tolerate exposure to hazards such as open moving machinery and unprotected heights. He could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He was further limited to simple and repetitive tasks in an environment that did not have strict adherence to production quotas. He required a cane when ambulating distances of 100 feet or greater or over uneven surfaces.

(Tr. 18).

Substantial evidence in the record supports the ALJ's RFC determination. The plaintiff often did not "demonstrate full range of motion" in his cervical and lumbar spine (*See, e.g.*, Tr. 769, 780, 878) and, as of 2016, he required a cane for ambulation (*See* Tr. 831). However, the evidence in the record provided also that the plaintiff was able to walk on his heels and toes (Tr. 737, 747, 769, 878–79), had full strength of his extremities (Tr. 736–37, 765, 769, 827, 831–32, 856, 878–79), and always produced negative straight leg raising tests (Tr. 780, 831). Moreover, in April 2016, Dr. Timell noted that the plaintiff "[sat] comfortably on the exam table, [and] move[d] about the room normally." (Tr. 777). Consultative examiner Dr. Kogan, whose opinion the ALJ afforded great weight, opined that the plaintiff experienced "no range of motion deficits and no neurological deficits that limit[ed] sitting, standing, walking, bending, lifting, carrying, reaching or fine finger manipulations[,]" and that these activities were limited only mildly by generalized musculoskeletal pain. (Tr. 554). Furthermore, the hearing test that the plaintiff

completed in 2009 revealed that, although the plaintiff's hearing was sloping to mild to moderate sensorineural hearing loss, it was otherwise within normal limits. (Tr. 595).

Moreover, the plaintiff represented that he cared for his wife by, *inter alia*, driving her to doctors' appointments and assisting her with bathing and washing. (Tr. 393). The plaintiff indicated also that he cared for two cats (Tr. 393), prepared simple meals (Tr. 395), and did household chores as needed (Tr. 396). The plaintiff noted that he went grocery shopping a couple of times per month, but that it took several hours because he moved slow due to pain. (Tr. 397). The plaintiff testified that he could use a computer and email and had no problems with his hands on the keyboard. (Tr. 62). In fashioning the plaintiff's RFC, the ALJ limited the plaintiff to less than light work and imposed additional limitations that were based on the objective medical evidence in the record. Accordingly, the Court concludes that substantial evidence supports the ALJ's well-reasoned and well-supported RFC determination.

C.  SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DETERMINATION AT STEP FOUR

The plaintiff argues that the ALJ erred at step four when he described the plaintiff's past relevant work and concluded that the plaintiff could perform his past relevant work. (Pl.'s Mem. at 22). The plaintiff maintains that his past relevant work was of a higher exertion and skill level than the job the ALJ described, and that the "mischaracterization of [the plaintiff's] past work is an error because by finding that [the plaintiff's] past work as an assembler was both light in exertion and unskilled, the ALJ was then able to find that [the plaintiff] could perform this work under his RFC as described by the ALJ." (Pl.'s Mem. at 23). The defendant responds that the plaintiff "only focuses on the job as actually performed" and that substantial evidence "supports that [the] [p]laintiff could perform his past relevant work as an assembler as generally performed." (Def.'s Mem. at 10).

"[I]n the fourth stage of the [disability] inquiry, the claimant has the burden to show an inability to return to h[is] specific job and an inability to perform h[is] past relevant work generally." *Clow v. Comm'r Soc. Sec.*, No. 1:13-CV-998 (GLS), 2015 WL 729697, at *3 (N.D.N.Y. Feb. 19, 2015) (quoting *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003)); *see also Whitehouse v. Colvin*, No. 3:13-CV-894 (MPS), 2014 WL 4685187, at * 4 (D. Conn. Sept. 19, 2014). "In other words, a claimant is not disabled if he can perform his past relevant work, either as he actually performed it or as it is generally performed in the national economy." *Clow*, 2015 WL 729697, at *3 (citing S.S.R. 82-61, 1982 WL 31387, at *2 (S.S.A. Jan. 1, 1982); *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981)). "In order to determine at step four whether a claimant is able to perform h[is] past relevant work, the ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work, and compare these demands to the claimant's residual capacities." *Id.* (citations and internal quotation marks omitted). "In making this determination, [a]n ALJ may rely on the claimant's statements, which are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." *Baker v. Colvin*, No. 5:12-CV-225 (GLS), 2013 WL 1296379, at *7 (W.D.N.Y. Mar. 28, 2013) (citation and internal quotation marks omitted). "An ALJ may also consult with a [vocational expert] who can provide evidence of 'the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy.'" *Id.* (quoting 20 C.F.R. § 404.1560(b)(2)).

At the plaintiff's 2017 hearing, the vocational expert classified the plaintiff's jobs as an "ultrasonic solderer," which was "light and semi-skilled, SVP 3," and an "assembler," which was "light and unskilled." (Tr. 78). The vocational expert noted, however, that both of the plaintiff's past jobs would fall into the medium exertional level as the plaintiff actually performed them. (Tr.

79). The ALJ asked the vocational expert whether a hypothetical individual of the plaintiff's age, educational level, and past work would be able to do the plaintiff's past work if limited to the following RFC:

> [R]estricted to light [exertional level], could not climb ladders, ropes or scaffolds or tolerate exposure to hazards, such as open moving machinery or unprotected heights. . . . could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl, and was further limited to simple and repetitive tasks in an environment that did not have strict production quotas.

(Tr. 80–81). In response, the vocational expert opined that the hypothetical individual would be able to do the plaintiff's past work of "assembler as typically performed." (Tr. 81). The vocational expert's answer remained the same even with the additional requirement that the individual be required to use a cane "when ambulating distances of 100 feet or greater or over uneven surfaces[.]"[16] (Tr. 81). On the basis of the vocational expert's testimony, the ALJ concluded that, through his date last insured, the plaintiff was able to perform his past work of an assembler as performed generally, noting specifically that, "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of this work, . . . the claimant was able to perform it as generally performed." (Tr. 30).

The plaintiff maintains that his job as an "assembler" "correlates more closely to that of Assembler, Special Machine," which is a "medium exertion, standard vocational preparation (SVP) 7 skilled job."[17] (Pl.'s Mem. at 23). The plaintiff, however, provided the vocational expert and the ALJ with a description of his past work as an assembler, explaining that he was responsible for "assemblies, putting assemblies together[,]" which did not require him to lift or carry a lot but, on occasion, required him to lift or carry "maybe" thirty pounds. (Tr. 57). Moreover, the plaintiff

---

[16] The vocational expert testified also about two additional jobs that existed in significant numbers in the national economy that this hypothetical individual could perform. (*See* Tr. 81). These jobs are discussed in Part V.D, *infra*.

[17] The plaintiff did not object to the vocational expert's classification of his past work at the 2017 hearing.

indicated on his "Work History Report" that he was an "assembler" and that this job required him to "buil[d] ultrasonic converters[,]" spray[] them with sealant[, and do] brazing and wire cutting." (Tr. 404). The plaintiff's explanation of his past work provided sufficient information from which the ALJ and the vocational expert could characterize the plaintiff's past relevant work. *See* S.S.R. 82-62, 1982 WL 31386, at *3 (noting that "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining skill level, exertional demands and nonexertional demands of such work"); *see also Emser v. Berryhill*, No. 1:16-CV-909 (MAT), 2018 WL 3390255, at *3 (W.D.N.Y. July 12, 2018) (concluding that the plaintiff "provided the ALJ with a sufficiently detailed description of her past relevant work . . . to enable him to consider whether that work was consistent with [the] [p]laintiff's RFC."). Accordingly, substantial evidence supports the ALJ's determination that the plaintiff could perform his past relevant work of "assembler" as performed generally in the national economy.

### D. SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DETERMINATION AT STEP FIVE

The plaintiff's final argument is that substantial evidence does not support the ALJ's step five determination that jobs existed in significant numbers in the national economy that the plaintiff could perform.[18] (Pl.'s Mem. at 24–25). Specifically, the plaintiff argues that the jobs that the ALJ concluded the plaintiff could perform do not exist in significant numbers in the national, state, or regional economies. (Pl.'s Mem. at 25). The defendant responds that the vocational expert "relied upon job incidence information from the [*Dictionary of Occupational*

---

[18] The ALJ's conclusion at step four of the sequential analysis directs a finding of "not disabled" and, therefore, the ALJ did not have to reach step five. The Court concludes that substantial evidence supports the ALJ's step four determination, so it likewise need not address the plaintiff's step five argument. Because the ALJ addressed step five, however, the Court will complete an analysis of the plaintiff's argument.

*Titles*] and professional experience" and, therefore, substantial evidence supports the ALJ's step five findings.  (Def.'s Mem. at 11–12).

"The Commissioner has the burden in step five of the disability determination to prove that the claimant is capable of working."  *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (citing *Perez*, 77 F.3d at 46).  "The Commissioner need show only one job existing in the national economy that [the plaintiff] can perform."  *Id.* (citing 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b)).  "It is insufficient to meet this level if there are only '[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where' the claimant lives." *Hernandez v. Berryhill*, No. 3:17-CV-368 (SRU), 2018 WL 1532609, at *16 (D. Conn. Mar. 29, 2018) (quoting 20 C.F.R. § 404.1566(b)).  "Within the Second Circuit, courts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers[]"; however, "[c]ourts have adopted a relatively low threshold number."  *Id.* (citations and internal quotation marks omitted).  "In looking at nationwide positions, courts in this District have routinely held that numbers below 30,000 are sufficient to satisfy the 'significant number' threshold."  *Id.* "Evidence from a vocational expert may be derived from the *Dictionary of Occupational Titles* and also from other reliable publications."  *Blanchard v. Berryhill*, No. 3:17-CV-1534 (KAD), 2019 WL 859266, at *7 (D. Conn. Feb. 22, 2019) (citing 20 C.F.R. § 404.1566(d)–(e)) (additional citations omitted).  "An ALJ may rely on vocational expert testimony where the expert identified the sources consulted to determine the job incidence factors." *Id.*

Here, the vocational exert testified at the hearing that a hypothetical individual with the plaintiff's age, education, past work, and RFC would be able to perform the jobs of a "solderer" and a "gluer."  (Tr. 81).  He testified further that there existed 50,000 solderer jobs nationally and

40,000 gluer jobs nationally.[19]  (Tr. 81).  The vocational expert explained that his testimony was based on the *Dictionary of Occupational Titles*, his "professional experience[,]" and "having viewed" the occupations.  (Tr. 81–82).  The plaintiff's counsel did not object to the job incidence data to which the vocational expert testified; nor did she question the vocational expert about the job incidence numbers during her cross-examination of him.  Accordingly, the ALJ properly relied in the vocational expert's testimony and, therefore, substantial evidence supports the ALJ's conclusion at step five of the sequential analysis.

VI.    CONCLUSION

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 16) is DENIED, and the defendant's Motion to Affirm (Doc. No. 22) is GRANTED.

This is not a recommended ruling.  The consent of the parties allows this Magistrate Judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment.  *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated at New Haven, Connecticut this 19th day of August 2019.

/s/ Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge

---

[19] The number of solderer and gluer jobs available nationally fall within the "low threshold" that courts in this Circuit have adopted.  *See Matteo v. Berryhill*, No. 3:17-CV-1821 (RMS), 2019 WL 644828, at *13 (D. Conn. Feb. 15, 2019); *Hernandez*, 2018 WL 1532609, at *16–17; *Consiglio v. Berryhill*, No. 3:17-CV-346 (SALM), 2018 WL 1046315, at *8 (D. Conn. Feb. 26, 2018) (26,400 national jobs); *Lillis v. Colvin*, No. 3:16-CV-269 (WIG), 2017 WL 784949, at *6 (D. Conn. Mar. 1, 2017) (16,770 national jobs); *Gilmore v. Comm'r of Soc. Sec.*, No. 15-CV-837 (NAM), 2016 WL 4079535, at *6 (N.D.N.Y. July 29, 2016) (20,620 national jobs); *Daniels v. Astrue*, No. 10 Civ. 6510 (RWS), 2012 WL 1415322, at *17 (S.D.N.Y. Apr. 18, 2012) (25,000 national jobs)